**Affirmed and Opinion filed June 11, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-18-01115-CV

### IN THE INTEREST OF P.N.T., A CHILD

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2017-04069J**

## O P I N I O N

This accelerated appeal arises from a final decree in a suit in which termination of the parent-child relationship was at issue. Tex. Fam. Code Ann. § 109.002(a-1). The child is Paige.[1] The appellants are her mother (K.M.), father (C.T.), and paternal grandparents (intervenors C.T. and F.T.). The trial court terminated Mother's and Father's parental rights and appointed the Texas Department of Family and Protective Services (the Department) to be Paige's managing conservator.

---

[1] We use pseudonyms or initials to refer to the children, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

Grandparents raise three issues: (1) the trial court lost jurisdiction and should have dismissed the case; (2) the trial court erred in denying them a jury trial; and (3) the trial court erred in appointing the Department, rather than them, as Paige's conservator. Mother and Father both challenge the evidentiary sufficiency to support termination; neither challenges the trial court's decision on conservatorship.

We begin with the procedural issues raised by Grandparents. First, they did not preserve error regarding dismissal of the case. Any error in failing to dismiss this case would have resulted in only a voidable judgment, not a void judgment, so their failure to preserve error is dispositive of that issue. Second, the trial court did not abuse its discretion in denying Grandparents a jury trial because they did not timely demand a jury trial.

Next, we turn to the substantive issues. Sufficient evidence supports the trial court's findings that (1) Mother and Father endangered Paige, and (2) termination of their parental rights is in Paige's best interest. Grandparents have not shown the trial court abused its discretion in appointing the Department as Paige's managing conservator.

Therefore, we affirm the trial court's decree.

## DISMISSAL

In their first issue, Grandparents contend the trial court should have dismissed the suit under section 263.401 of the Family Code, the statute that sets the deadline to begin trial in a termination case.

The version of section 263.401 that governs this case[2] states in relevant part:

---

[2] Section 263.401 was amended effective September 1, 2017. Act of May 28, 2017, 85th Leg., R.S., ch. 319, § 12, sec. 263.401, 2017 Tex. Sess. Law Serv. 716, 721 (codified at Tex. Fam. Code Ann. § 263.401(a)). The amended version applies only to suits filed on or after the effective date. *Id.* § 34, at 735. This suit was filed in August 2017, before the effective date. Therefore, the

(a)     Unless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b-1), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court shall dismiss the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child.

Act of May 29, 2015, 84th Leg., R.S., ch. 944, § 38, sec. 263.401, 2015 Tex. Sess. Law Serv. 3268, 3283 (amended 2017; current version at Tex. Fam. Code Ann. § 263.401(a)). In plain English: with certain exceptions, the deadline to begin trial of a termination case is the Monday following the first anniversary of the day the trial court appointed the Department as the child's temporary managing conservator. A party who seeks to enforce the one-year deadline must file a motion to dismiss before a trial on the merits commences. Act of May 27, 2007, 80th Leg., R.S., ch. 866, § 3, sec. 263.402(b), 2007 Tex. Sess. Law Serv. 1837, 1838 (amended 2017; current version at Tex. Fam. Code Ann. § 263.402).[3]

The trial court appointed the Department as Paige's temporary managing conservator on August 22, 2017.[4] Trial began on July 26, 2018, less than one year later. Accordingly, dismissal was not required because the trial began timely under section 263.401(a).

On appeal, Grandparents contend trial did not really begin until October 22, 2018. They assert the proceeding on July 26, 2018 was a sham trial, conducted solely

---

dismissal deadline in this case is governed by the 2015 version of the statute. *Id.* § 33, at 738.

[3]As with section 263.401, the version of section 263.402 in effect as of the date of this opinion applies only to suits filed on or after September 1, 2017. Act of May 28, 2017, 85th Leg., R.S., ch. 319, §§ 33, 34, 2017 Tex. Sess. Law Serv. 716, 735, 738.

[4] Grandparents contend the trial court appointed the Department as Paige's emergency temporary managing conservators on August 9, 2017, the day suit was filed. The record does not contain such an order. The docket sheet indicates two orders were signed on August 9 but does not suggest either order appointed the Department as Paige's temporary managing conservator.

to circumvent the 12-month deadline. They filed a motion to dismiss on October 16, 2018. If trial did not begin until October 22, 2018, they say, then their motion to dismiss was timely under section 263.401(b)(2), and the judgment is void.

We first consider whether the trial court's alleged error in not dismissing the case rendered the judgment void or merely voidable. "[A] judgment is void only when it is shown that the court had no jurisdiction of the parties or property, no jurisdiction of the subject matter, no jurisdiction to enter the particular judgment, or no capacity to act as a court." *Browning v. Placke*, 698 S.W.2d 362, 363 (Tex. 1985). The dismissal dates in the version of section 263.401 applicable to this case are not jurisdictional. *In re Dep't of Family & Protective Servs.*, 273 S.W.3d 637, 641–42 (Tex. 2009) (orig. proceeding). A judgment is not void merely because it was made after the dismissal dates in that version of section 263.401.

If a judgment is merely voidable, challenges to that judgment are subject to the rules for preservation of error. *See Roccaforte v. Jefferson Cty.*, 341 S.W.3d 919, 923 (Tex. 2011). To preserve a complaint for appellate review, the record must show (1) the complaint was made to the trial court by a timely and sufficiently specific request, objection, or motion, and (2) the trial court either ruled on the request, objection, or motion, or the trial court refused to rule and the complaining party objected to the refusal. Tex. R. App. P. 33.1(a). We assume for the sake of argument that Grandparents' motion was timely. The record does not reflect that the trial court ruled on the motion, nor does it reflect that Grandparents sought a ruling but the trial court refused to rule. Grandparents did not mention the motion to dismiss when trial resumed on October 22. Based on these facts, we conclude Grandparents have not preserved error regarding dismissal. We overrule their first issue.

**JURY TRIAL**

Grandparents next contend the trial court erred in denying their request for a

4

jury trial. We review the trial court's denial of a jury demand for an abuse of discretion. *In re A.L.M.-F.*, No. 17-0603, __ S.W.3d __, 2019 WL 1966623, at *8 (Tex. May 3, 2019). A trial court abuses its discretion when its decision is arbitrary, unreasonable, and without reference to guiding principles. *Id.* We examine the entire record in our review. *Mercedes-Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex. 1996).

The right to a jury trial is guaranteed by the Texas Constitution. Tex. Const. art. I, § 15 ("The right of trial by jury shall remain inviolate."). The existence of a substantive right is distinct from the procedures constitutionally required to protect that right. *A.L.M.-F.*, 2019 WL 1966623, at *8. Demand for a jury trial in a civil case is governed by Texas Rule of Civil Procedure 216. The rule requires both a written request and, unless otherwise provided by law, payment of a fee. *See* Tex. R. Civ. P. 216. The written request must be filed a reasonable time before the date set for trial on the non-jury docket, but not less than 30 days in advance. Tex. R. Civ. P. 216(a).

Grandparents filed a written jury demand and paid the jury fee on July 24, 2018. Trial was set to begin two days later, on July 26. Grandparents did not comply with rule 216(a) because they did not make their request at least 30 days in advance of the trial setting. Accordingly, the trial court did not abuse its discretion in denying their request for a jury trial.

Similar to their claim for dismissal, in which they argued the July 26 trial was a sham, Grandparents contend the trial **setting** for July 26 was also a sham. For that reason, they say, their jury request was timely under rule 216 because it was made more than 30 days in advance of the real trial setting of October 22. Accepting their contention as true only for the sake of argument, we nevertheless conclude Grandparents did not preserve error. To preserve a complaint about the denial of a jury trial, the complaining party must object when the trial court proceeds with a

bench trial. *In re K.M.H.*, 181 S.W.3d 1, 16 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (supp. op. on reh'g). Grandparents did not object to the trial court's conducting a bench trial. Therefore, they did not preserve any error in the denial of a jury trial. We overrule their second issue.

### TERMINATION AND CONSERVATORSHIP

We now turn Mother's and Father's challenges to termination and Grandparents' challenge to conservatorship.

## I. Evidence

The following witnesses testified at trial: Department investigative caseworker Shaun Santiago; two deputy sheriffs from Montgomery County, Troy Moseley and Cody Lowry; Paige's therapist, Diane Vines; the psychologist who evaluated Paige, Andrew Brams, Ph.D.; Father's therapist, Kelly Landry; Mother; Father; Grandmother; Grandfather; Department conservatorship caseworker Victoria Palmer; Paige's guardian ad litem, Susan Arredondo; Father's common-law wife, Dana; child welfare and placement expert Lisa McCartney; and Paige's foster mother.

The exhibits admitted into evidence without objection include: Santiago's pretrial removal affidavit; photos of Paige; Paige's medical records; criminal records concerning Mother's boyfriend, Luke, who was accused of causing the injuries to Paige that began this case; Paige's educational records; documentation regarding Mother's and Father's attendance and completion of parenting classes; records from one of Father's therapists; police records regarding Father; drug and alcohol test results for Grandparents; Grandmother's medical records; the Department's report of Grandparents' home study; photos of Grandparents' home; and a status report by the Department. On the Department's request and without objection from the other parties, the trial court took judicial notice of all the orders in this case. Admitted over

6

Mother's and Father's objection were family service plans the Department created for them; a report of Brams' psychological evaluation of Paige; photos of Father; and printouts of text messages between Father and Dana.

## A.      Events leading to removal and this lawsuit

The Department received a referral on a Sunday in July 2017 alleging physical abuse and medical neglect of Paige, then six years old. Paige presented at the hospital with severe bruises on her face, arms, and knees, allegedly due to falling while standing in the bathtub.

### 1.      Paige's injuries

Santiago and J. Rouse, an investigator for the Harris County Sheriff's Office, each observed Paige at the hospital. Santiago's description is taken from his affidavit and his testimony. Rouse's description is taken from the criminal complaint against Luke regarding Paige's injuries.

Santiago saw Paige was "covered with bruises." Specifically, she had large bruises on her forehead and the side of her face, both arms, and both legs. Her face and one of her knees appeared swollen. She had black eyes. And she had "clumps of hair" missing, leaving bald patches on her head. Santiago testified, "[T]here is no way, in my experience, that a child could receive that many bruises from one or two falls in the bathtub."

Rouse observed Paige to have "swollen red marks to her forehead, bruising under each eyes [sic], and bruising to her elbows." Rouse reviewed Paige's medical records. They indicated she had "6 contusions to her face to include 'swelling to the forehead.'" According to the records, Paige told a child life specialist that "[she] was hurt on purpose, the wall did it." The records state Paige's injuries were not consistent with self-injury.

7

### 2. Mother's account

### a. Mother's statements at the hospital

Santiago and Rouse both interviewed Mother at the hospital. The facts in this section are taken from Santiago's affidavit and testimony and the criminal complaint against Luke.

***Statements to Santiago.*** Santiago testified that as soon as he entered Paige's hospital room, "[Mother] immediately said, It wasn't me. She fell in the shower. I was at work." According to Santiago's affidavit, Mother offered him the following version of events leading up to Paige's hospitalization.

Paige had been with Grandparents and was set to be returned to Mother at her apartment on Saturday. Mother had to go to work, so she instructed Grandparents to drop Paige off with Luke. She told Santiago that Luke had begun watching Paige on his own just the previous week. When Mother called home, Paige was watching television and seemed happy. Luke called Mother around 7:00 p.m. to report Paige had urinated on herself. Mother told Santiago that Paige was fully potty-trained and had never urinated on herself.

"A short while later," Luke called Mother's work again and left word with a co-worker of an emergency at home. Mother was too busy with customers to take the call or call him back. She left work around 10:00 p.m., and she did not talk to Luke until she got home.

Once home, Luke told Mother what had happened. Luke said he directed Paige to shower to wash off the urine. He said Paige got undressed behind the shower curtain, then handed him her clothes. He gave Paige a sponge with soap. At that point, Luke told Mother, Paige became upset and screamed for Mother, and during her distress she fell, hitting her head twice on the way down. Luke said he "bear

hugged" Paige to calm her down, then put her to bed. Santiago asked if Mother was comfortable with Luke bear hugging her naked daughter, and Mother emphatically said no.

Upon hearing what happened, Mother went to Paige's bedroom. Mother told Santiago she did not see bruises on Paige's head. Still, Mother wanted to take Paige to the hospital, she told Santiago, but she did not because Paige was "difficult to wake up." She said it did not occur to her to call 911. Mother said she stayed up all night and checked on Paige frequently. She also told Santiago that Paige had been diagnosed as "mentally disturbed." Mother said Paige hits herself against the wall, causing bruises, and pulls out her hair.

Mother took Paige to a regional hospital at noon the following day, Sunday. At some point that afternoon, Paige was transferred to a hospital in the Houston Medical Center.

***Statements to Rouse.*** According to Rouse, Mother said she had "left for work that afternoon leaving [Paige] in the care of [Luke] . . . , who is her fiancé." When she returned home that night, Mother told Rouse, she saw Paige had the injuries Rouse observed. Luke reportedly told Mother he was helping Paige take a shower when she "became angry and began hitting her head on the wall," so he "had to bear hug [her] to prevent her from hitting her head further." Mother said Luke told her Paige "pulled away and landed on her elbows and knees." Mother took Paige to the hospital after Paige complained of a headache the following day.

### b. Mother's trial testimony

At trial, Mother changed her account. She said Father was supposed to have custody of Paige for all of July, though Grandparents frequently took care of her for him. Even though Grandparents should have returned Paige to Father after their visit, Father allegedly had told Mother the previous evening that he had his "own life,"

9

and Paige was "[Mother's] problem." Mother testified she did not know Grandparents would bring Paige to her apartment, and she found out only when she called home and Luke said Paige was watching television. Grandmother corroborated that testimony when she confirmed she and Grandfather brought Paige to Mother's apartment at Father's direction.

Mother testified Luke texted her, not called her, about Paige's urination. She said she responded by instructing Luke to tell Paige to "change herself" and Mother would "take care" of her in the morning, by which she meant she would bathe her. She explained she does not let Paige in the bathtub by herself.

At some point thereafter, Mother testified, Luke called the store where she worked and said he needed to speak with Mother. She testified he did not say there was an emergency. Mother was not alarmed, she explained, because Luke "always called [her] job." Just as she had told Santiago at the hospital, she testified she was too busy to talk to Luke at the time. But contrary to her statement to Santiago that she did not communicate with Luke until she got home, at trial she testified she texted Luke later, asking him if Paige was okay. He allegedly responded Paige was fine and he had given her a warm rag and told her to wash herself.

Paige was already asleep when Mother got home close to midnight. As Mother walked in the door, Luke told her Paige had slipped but did not say she had slipped in the bathtub. Rather, he "just said she fell and—he said it was outside she hurted [sic] her knees and that was it." Mother testified Paige falls down a lot, is "klutzy," and has balance problems. As a result, she said, Paige normally has bruises on her knees. Counsel for the Department asked Mother if Paige's forehead was bruised. Mother responded:

> A.   Honestly, I didn't even check, like, they didn't tell me she was injured—he didn't tell me she was injured. He just told me she

10

> slipped and that was it.
>
> . . .
>
> Q.   But having somebody tell you your 6-year-old child, who never has accidents, has [urinated on] herself, didn't raise enough concern for you to go and check on her; is that correct?
>
> A.   I guess not.

It is not clear whether Mother looked in on Paige but did not inspect for bruises or did not see Paige at all. Regardless, Mother testified she did not try to wake Paige. On cross-examination, Mother was asked about the discrepancy between her testimony and Santiago's testimony that Mother told him she tried but was unable to wake Paige. She insisted Santiago was lying. If she had tried but could not wake Paige up, Mother testified, she would have taken her to the hospital.

The next morning, Paige, in a position in which Mother did not have a full view of Paige's head, told Mother her head hurt. Mother testified:

> I said, Well, let me get you some Tylenol. She moved her hand and I said—I'm not going to lie—I said a cuss word. I said, What the— happened? And she says, Oh, I fell. Remember? I said, No. I said, I was just told you hurt your knee that was it.

Mother gave Paige Tylenol, then Luke drove them to the hospital.

Mother testified she does not believe falling in a bathtub, even falling twice, could have caused Paige's injuries. If she could go back in time, she said, she would have woken Paige.

### 3.   Paige's account

Santiago interviewed Paige while Mother was in the room. He described Paige as "still very scared." According to Santiago's affidavit, Paige first told him she fell in the bathtub. She said she was in the bathtub because she needed to take a shower

because she had urinated on herself. Paige said Luke was making her stand in the corner because he was angry with her. She needed to use the bathroom and ended up urinating on herself. As she stood in the bathtub, Luke handed her a sponge, and she fell. Paige told Santiago she did not know how she fell and could not remember. At trial, Santiago called attention to how Paige changed her story: "She said that she had fallen in the shower. And then she changed to say that she had peed herself. That [Luke] had yelled at her. . . . And that he had placed her in the shower and her mom wasn't there so she fell in the shower."

### 4. Luke's account

Luke told Santiago he and Mother began dating in September 2016 and moved in together in March 2017. Contrary to Mother's assertion that Luke had been watching Paige for only a week, Luke told Santiago he had been watching Paige on his own for two or three months. He said she had no bruises or marks when Grandparents dropped her off. Luke contended the only methods of punishment he practices on Paige are making her stand in the corner or taking away her phone.

Luke offered the following account. He asked Paige to pick up her toys, but Paige talked back to him, then had a temper tantrum in which she banged her head against the wall. He took her eyeglasses so they would not break and put her in another part of the apartment. She kept banging her head against the wall, and then she urinated on herself. He believed she was having a seizure. But he could not explain his belief, admitting Paige had never had a seizure before. He also echoed Mother's statement that Paige had not urinated on herself previously. Luke told Santiago that Paige fell on the floor, so he picked her up, carried her to the bathroom, and put her in the shower. He said Paige disrobed behind the shower curtain and gave him her clothes. He then turned on the water and gave her a sponge with soap. The affidavit does not reflect what, if anything, Luke said happened after he handed

12

Paige the sponge.

Luke told Santiago he sent Paige to bed and checked on her every 30 minutes or so because he knew she was injured. Still, he admitted, it never occurred to him to take her to the hospital. Luke said he did not consume alcohol before the incident in question but drank four or five beers around 9:30 p.m.

### 5. Mother's departure from the hospital

Santiago confronted Mother about the discrepancies between her and Luke's versions of events. Mother became extremely agitated, saying the Department was "trying to pin this" on her. She also said Luke was moving out, and she insisted she "needed to be there." Mother left the hospital before Paige was discharged. Paige could not be placed with Father due to his criminal history. She was placed in a parental child safety placement (PCSP) with Grandparents. Santiago testified he had no problem with that placement at that time.

### 6. Paige's interview at the Child Assessment Center

Paige was interviewed five days later at the Child Assessment Center. Santiago and Rouse both watched the interview. During that interview, she disclosed that Luke banged her head against the wall, which made her urinate on herself. She said he threw her into the bathtub, then yelled at her to get out, then dragged her out of the bathtub and pushed her to the floor. She told the interviewer her body felt sad when he pushed her to the floor. Rouse believed Paige to be "reliable and credible."

Santiago called Mother that day and told her the Department would be seeking custody of Paige. Mother became very irate and denied abusing Paige. Santiago assured her the Department did not believe she physically abused Paige but did believe she failed to timely seek medical attention for her daughter. Mother denied Luke abused Paige, saying Luke is a good man and Paige is easily influenced to say

13

whatever people want her to say. When Santiago reiterated that the evidence implicated Luke, Mother said, "Go f*** yourself and I will get a lawyer and see you in court."

At trial, Mother denied her denial. She said she did not tell Santiago that Luke could not have hurt Paige. She said she believes Luke caused Paige's injuries. She also testified, "The night . . . Mr. Santiago told me I could not have my daughter[,] I called [Luke] and told him to get his stuff out and get his kid out and get out of my apartment."

### 7.    Removal and this lawsuit

A month to the day after Paige was hospitalized, the Department removed Paige and filed this lawsuit for protection of a child, conservatorship, and termination. The record does not reflect what precipitated the filing at that time.

The trial court conducted a full adversary hearing two weeks later, after which it named the Department as Paige's temporary managing conservator. Paige remained with Grandparents. About six weeks later, the trial court signed an order approving the family service plans the Department created for Mother and Father and requiring the parents to comply with their respective plans.

### B.    Paige

### 1.    Before and shortly after removal

Paige was significantly developmentally delayed before she came into care. Child placement specialist Lisa McCartney testified Paige could not read and did not know numbers.

Paige had lice at Grandparents' home. They worked hard to eradicate the lice, but the outbreak was ongoing when she arrived at her foster home. The foster mother described Paige as frail and underweight at that time. Paige also arrived with "4-inch

14

blades" in her suitcase. The record does not reflect where she got the knives. Emotionally, the foster mother testified, Paige was very nervous.

According to Paige's foster mother, "Everybody noticed her delays right away, between the doctor and the school." It took Paige "a while to kind of process information and then reply to somebody." Speech therapy, occupational therapy, and special education services were already in place, but they were not appropriate for Paige's needs.

The foster mother testified Paige would return to her home "very upset" after a family visit, reporting "a lot of acting out, screaming for hours at a time." It is not clear if the upsetting visits were with Mother, Father, Grandparents, or all of them.

## 2. Therapy

Diane Vines had been Paige's therapist for about a year at the time of trial. Vines estimated Paige had at least 20 therapy sessions with her.

Vines recalled her first meeting with Paige. Grandparents brought her to the session and stayed in the room. Paige was hypervigilant, keeping her eyes wide open. She had a hard time saying anything. Vines also noted Paige moved slowly, what Vines termed "psychomotor retardation." When Vines would ask her a question, Paige would look to Grandparents. Though Paige never said she was afraid of them, Vines believed Paige feared Grandparents: "It was her facial expression, it was her body language, it was her inability to respond, to relax." Vines agreed children can be apprehensive the first time they see a therapist, even for a few sessions, but "not to that degree." She testified, "Her presentation was not normal, not even for a first session. . . . She appeared extremely uncomfortable." Paige's demeanor was "very guarded," according to Vines, and she was "[v]ery closed and withdrawn." Still, Vines testified, she had no concerns at that time with Paige's placement with Grandparents. That was the only time Vines saw Grandparents.

Paige was "a different child" when she arrived for the second session, according to Vines. Her foster mother brought her that time. Vines described Paige as "less terrified, less dysregulated," and overall more relaxed and open. She smiled and talked. When Vines asked her questions, Paige answered some on her own and looked to her foster mother for reassurance or answers on others. Vines called the difference in Paige's demeanor between the first and second sessions "striking."

Even with that progress, Paige struggled to feel comfortable in therapy. Most children take several sessions to get used to therapy, Vines said, but Paige took "[m]any, many, many months." Vines practices play therapy, and Paige "had a hard time playing, period. She had a hard time being in the room with the door closed." Vines testified it is not normal for a six-year-old child to have a hard time playing in therapy once they acclimate to the format.

Lack of trust is the biggest challenge Vines observed in Paige. She explained: "She's appeared to be scared to death of pretty much everything. She is still a little reticent. She—it took me a long time for her to be able to have therapy in the room with the door shut without the foster mother there." Vines said Paige had made progress, to be sure, but was not ready to be discharged. Vines' therapy goals for Paige are "trust and relationships and reduce symptomatic behavior."

Paige told Vines how she was treated by the various adults involved in this case. She confirmed she had not been sexually abused. She said Luke hit her and, in what appear to be Vines' words, "smacked her around." Father, she told Vines on several occasions, was "mean," and she did not like it when he and Dana fought. Paige mentioned "name calling" by Grandparents, but Vines did not elaborate. Paige made no outcries regarding Mother, nor did she suggest Mother knew of Luke's abuse.

### 3.     Psychological evaluation

Andrew Brams evaluated Paige in various realms, using both quantitative and qualitative assessments. She scored in the range for "borderline intellectual functioning," with an IQ between 70 and 75. He testified a child with an IQ in that range will "likely have difficulties of [sic] certain aspects of daily living skills and academic prowess." Paige will need educational help for the foreseeable future.

Personality testing revealed Paige struggles to organize her thoughts. Brams said she may see aspects of her world in a "very simplistic fashion." When asked if Paige was "easily coachable," Brams answered, "[S]he may have difficulty distinguishing between what is realistic and what someone else's impressions are." He opined Paige will likely find transitions hard and "may be fearful of transitions as she has little control or predictability of that experience."

Brams was asked about the effects on a child of being in a home with verbal and physical abuse. He explained:

> There is [sic] a lot of issues that go along with that. One is that there is a question of destructive modeling to the child that you can be dysregulating in your approach to dealing with your anger. It also creates potential issues with bonding and it creates issues with the ability to trust and to overall use emotions in constructive ways.

> Children with these type [sic] of histories that come from these environments tend to have difficulties connecting with others and often use anger, distance, [and] aggression to be able to keep themselves safe.

Brams recommended Paige's caregivers provide as much continuity, predictability, and structure in the home as possible. If behavior problems were to arise, he suggested they provide some sort of behavioral contract by which she could earn rewards for different types of pro-social behaviors. Brams testified Paige needs ongoing psychotherapy, at least two or three times per month, to help her with

"integration closure of any possible experiences that she may have had that were construed as traumatic or very stressful." Further, he opined, Paige may benefit from a psychiatric evaluation regarding selective attention issues he perceived.

### 4.    Academic records

A report card for Paige's kindergarten year, 2016–17, shows Paige was "emerging – exploring concept" or "still developing – showing progress" in most subject areas. "Emerging" is defined as "a stage in which children develop an awareness of their surroundings and exhibit a need for more instruction and interaction with objects, people, events and concepts." "Still developing" means "a stage in which children develop an understanding of the components and attributes of their surroundings and exhibit a need for more practice with objects, people, events and concepts." She changed school districts before first grade. Her first quarter report card for first grade indicates Paige was functioning in most areas at a "below basic" level, defined as "working below grade level standard; needs strong instructional support."

Two Admission, Review, and Dismissal (ARD) Committee meetings were held in October 2017 to build Paige's Individualized Education Program (IEP). According to the IEP report, Grandparents attended the first meeting in early October, and no parent or guardian attended the second at the end of the month. The report includes the following statement:

> [Paige] is a first grade student at [school name omitted] who qualifies for special education services as a student with an Emotional Disturbance.

"Emotionally disturbed" is the phrase Mother used to describe Paige's diagnosis to Santiago in the hospital. The report goes on to detail Paige's specific strengths and weaknesses and establish an educational plan to meet her needs.

18

### C. Mother

#### 1. Relationship with Luke

Mother met Luke in September 2016, and they moved in to an apartment together in April 2017. Luke has two children; their mother has custody of them, but they visited Luke at the apartment he shared with Mother. She knew Luke had "some DWIs" and "maybe [a] possession" conviction in his criminal history. She testified, "I mean, he had one beer around me, like, maybe a day," and she also said Luke told her he stopped drinking.

Before the incident giving rise to this case, Mother never knew of Luke to hit or abuse Paige or his own daughters in any way. Paige never suggested to Mother that Luke was hurting her.

Mother testified she is no longer engaged to Luke or in contact with him or his family. She said she later discovered Luke's location from his friends and passed that information on to the detective assigned to the criminal case.

#### 2. Service plan

The Department created a service plan for Mother with many goals, including: protect Paige from harm; put Paige's needs ahead of her own; protect Paige from future abuse or neglect; and understand the serious nature of the situation that placed Paige in Department custody. To help her achieve those goals, Mother's service plan required her to, among other things: "show extreme protective ability" of Paige; not allow Luke to live in her home; ensure Luke has no physical or verbal contact with Paige; complete parenting classes; participate in a psychosocial evaluation and follow all the evaluator's recommendations; participate in individual therapy; and maintain and provide proof of stable employment and safe housing.

Caseworker Palmer testified Mother completed all requirements of her service

plan except providing proof of employment and stable housing. However, Palmer admitted she knew Mother was working at Traveler's Inn and living with her aunt. Palmer testified about qualitative shortcomings as well; she said Mother had not demonstrated she understood the severity of why Paige was under Department care or believed Paige's outcries of abuse.

### 3. Willingness and ability to care for Paige

In July 2016, a year before the events giving rise to this case, Paige was visiting Grandparents and Father and returned to Mother's home with bruises. Mother texted Grandparents asking, "Where the hell did these bruises come from?" Paige's pediatrician reported the bruises to the Department. Mother said she cooperated with the Department's investigation because she believed "there was abuse and neglect at the hands of" Father and Dana.

Mother's inaction a year later concerned three professionals involved in this case. The two Department caseworkers, Santiago and Palmer, testified Mother's inaction regarding Paige's injuries endangered Paige. Santiago said Mother minimized and was in denial about the seriousness of the incident. He characterized her inaction as medical neglect. McCartney testified Mother failed to protect Paige from abuse and neglect by allowing Paige to be around "dangerous individuals." McCartney said Mother displayed "a pattern of engaging in relationships with people who are abusive and potentially harm her child."

McCartney also commented on Mother's inaction regarding Paige's delays. Paige's pediatrician reportedly referred her to a neurologist and for an Early Child Intervention (ECI) evaluation, neither of which Mother pursued. On cross-examination, Mother's lawyer asked if McCartney was aware Paige had been transferred to a different school and both Mother and Grandparents had been working with the school district for two years to ensure Paige received the services

20

she needed. McCartney said she could not answer that question with a yes or no.

Guardian ad litem Susan Arredondo expressed concern about Mother's parental abilities, citing Mother's changing version of events before Paige arrived at the hospital. Arredondo said, "[W]e have grave concerns that she is still not admitting to why [Paige] came into care."

Grandmother testified she did not know if it was safe for Paige to return to Mother.

### D.     Father

#### 1.     Physical and verbal abuse

Father admitted his anger "gets the best of him" sometimes. The record contains evidence of domestic violence and verbally abusive behavior against Paige, Dana's children, Mother, and Dana. Grandfather said he sees "anger issues" in Father but never directed toward Paige. His therapist, Kelly Landry, testified Father was participating in a Battery Intervention and Prevention Program (BIPP) of his own volition, not to fulfill a court requirement.

Mother testified Father choked her while she was holding Paige. She also confirmed he curses at her, Mother, at visitations. She described Father as "kind of" a violent man.

The Department received four referrals regarding Father between May and July 2016: three alleging physical abuse (including the one made by Paige's pediatrician) and one alleging sexual abuse. All but the one involving Paige were ruled out. The record suggests Dana's children were the subject of the other three referrals. Father contended Dana made those referrals in retaliation for arguments they were having. Paige told Palmer she saw Father hurt Dana and Dana's daughter, Mallory. (Paige also alleged Dana punched her, Paige, but the record does not

21

indicate when that allegation was made or when the alleged assault occurred.)

Paige told Mother's father that Father hit her with a belt and pinched her. That was the incident for which Paige's pediatrician called the Department in July 2016. When asked at trial what that case was about, Father responded, "I have no idea." He denied physically abusing Paige.

In August 2017, Montgomery County Sheriff's Office deputies responded to two calls from Dana less than 24 hours apart. In both, Dana alleged Father committed physical violence against her and her son, Michael. Dana had bruises that were consistent with her allegations. Father was not in the home when Deputy Troy Moseley responded to the second call. Had he been there, Moseley testified, Moseley probably would have arrested him for family violence.

Another deputy investigated an allegation against Father in October 2017, this time by Dana's daughter, Mallory. Mallory said Father choked her. The responding deputy, Cody Lowry, did not see evidence to support the allegation. Lowry spoke to Father briefly on the phone and asked him to meet. Father refused, saying he had warrants. Lowry assured him he had no outstanding warrants, but Father still declined. Although criminal charges were not filed, the Department found reason to believe Mallory's allegation.

The record contains undated print-outs of the following text messages Father allegedly sent Dana:

FATHER: Keep it up and I will come back and I'll beat your f****** head in (asterisks in original)

DANA: I'm just a useless fat whore to use for your punching bag. Goodbye

DANA: Go ahead now I have a threat to show the cops. Thanks for that in writing

FATHER: Go ahead f****** b**** I f****** hate you I will f****** kill you b****. Go have your phone all you f****** want to b**** . . . . (asterisks in original)

Father admitted sending other texts admitted into evidence but denied sending these. Dana testified she and Father were still together at the time of trial.

## 2. Behavior regarding people of other races

Father used racial slurs against and in reference to another caseworker, including calling her a n*****. He testified he used that language because he "was mad." He admitted he sent this text message to Dana about that caseworker:

FATHER: She's trying everything she can do to try and f*** my world up but she's not doing s*** to [Mother] that really abused her (asterisks added)

DANA: Yeah and she is going to try to get her nose into my case. I'm not about to let that happen.

FATHER: Get on the god dasm [sic] phone then with her that n***** is dead I'm done with her I'm f*** her [up] (asterisks added)

He admitted posting Nazi symbols on his Facebook page. When asked why, he answered, "I went through phases in life." He denied going through a "white supremacy phase," though, and he insisted a tattoo of a cross on his chest that resembled the Nazi symbol he posted did not symbolize white supremacy. He said he removed the photos from Facebook.

## 3. Therapy

Father had two therapists over the course of this case. The second, Landry, had been counseling him for seven months at the time of trial. He was supposed to have two to four sessions per month but had only nine sessions total.

Landry testified about her initial impressions:

[H]e was angry, impulsive. Had a hard time, kind of, managing his emotions. So, one of the things that we were trying to work on was his anger management, kind of, managing his impulses. We talked about parenting skills and things like that.

Father struggled with understanding why his rights could be terminated, Landry said, because he was not the one who hurt Paige. She said she could understand his frustration. When Landry assessed Father, she recommended he undergo a psychiatric evaluation for possible medication management.

At some point, Landry provided the Department with a written report of her concerns with Father. The document does not appear to have been offered into evidence, but Landry testified about it. She confirmed using the following descriptors of Father in her report: "aggressive," "impulsive," "demeaning and controlling," "easily angered and lashes out verbally towards his girlfriend," "more than once uses profanity," "fails to take any responsibility," and "explosive temper."

Father has made "minimal" progress in therapy, according to both Landry and Father. She offered this example:

He still gets very verbally aggressive. He lashes out. He will pace back and forth. He will yell. He will cuss. He will walk out, slam doors. So, when I say very little, it may be before I couldn't even get him to calm down at all. Now, I can give him maybe 10 minutes or 15 minutes and he will at least maybe come back in the room with me.

Landry attributed Father's slow growth to his continued denial that he commits domestic violence. Her therapy goals for Father are admitting he commits domestic violence, parenting skills, anger management, and impulse control. She has not discharged him from therapy.

### 4. Service plan

Father's service plan was similar to Mother's; the primary difference was Luke was not implicated in Father's plan. Palmer testified Father completed all the

requirements of his service plan except individual therapy, which he was still attending, and providing proof of stable employment and housing. Father testified, however, he worked consistently and lived with Dana throughout this case, even though his name was not on the lease. Arredondo confirmed Father had been working consistently but had not provided appropriate documentation of employment. Palmer believed Father, like Mother, did not understand the gravity of the events that put Paige under Department care.

### 5.    Willingness and ability to care for Paige

Father's relationship with Mother ended four or five years before trial. Their custody of Paige was governed by a standard possession order, under which Father had Paige the first, third, and fifth weekends of every month and a full month in the summer. Father said he did not remember that he was supposed to have Paige for one summer month, and he did not remember taking Paige for a full month at any time. He lived with Grandparents for "a long time," so Paige also stayed in their house during his periods of custody. Child support payments are deducted from his paycheck. He did not recall the exact amount he pays monthly; he estimated $200.

Father testified he was aware Paige had significant delays emotionally, physically, and intellectually. He did not take her to a doctor or seek other treatment regarding those delays.

Father said he did not like that Luke was living with Paige. When asked if he did anything about it, Father responded, "What am I supposed to do to [sic] that?"

Arredondo worried Father's lack of impulse control coupled with Paige's frequent "emotional breakdowns" spelled disaster because he would not be able to manage them. She also expressed concern about the effect on Paige of the volatility of Father's relationship with Dana.

Palmer believed Father is a threat to Paige, but she acknowledged she had not seen him hurt or mistreat Paige. McCartney agreed Father had not demonstrated willingness and ability to protect Paige:

> He has been involved in a number of [Department] cases involving [abuse of] children, including his stepchildren. He is aggressive and has . . . threatened a [Department] worker, has threatened his current paramour, or wife. He has also threatened the mother of the child before and engaged in domestic violence.

> [Paige] . . . also presented at her pediatrician's with marks on her buttocks that she said [Father] pinched her bottom and hit her with a belt.

Grandmother was asked if was safe to return Paige to Father. She responded, "Not at this time, no."

### E.    Grandparents

Grandparents have been married for roughly 30 years. Father is Grandmother's son from her previous marriage. That marriage ended in divorce in California. Custody of Father and Grandmother's other son was awarded to their father. The record suggests the ex-husband alleged Grandmother was "taking too many pills," an allegation Grandmother denied.

#### 1.    Grandmother's medications

Grandmother testified she has had chronic back pain since 2002 due to her hysterectomy. She underwent back surgery seven times. A letter signed by her doctor listing her prescribed medications was admitted into evidence. Her prescriptions to treat "chronic pain syndrome and injury of nerve root" include Fentanyl (one patch every 48 hours); acetaminophen-hydrocodone bitartrate (325 mg–10 mg 3 times/day); Neurontin: (400 mg 4 times/day); carisoprodol (brand name Soma) (350 mg 3 times/day); Provigil (200 mg 2 times/day); and amitriptyline (100 mg 2 pills

at bedtime). She was also prescribed alprazolam (brand name Xanax) for anxiety and major depressive disorder. The letter states Grandmother signed a pain management contract "as required." At trial, Grandmother said she takes her medication as prescribed  but does not take the full dose if she does not need it.

Grandmother contended she is fully able to care for Paige and manage her household while on her medications. Father and Grandfather echoed that assertion in their testimony. Grandmother testified she drives regularly, her doctor knows she drives, and her driver's license has no restrictions.

But Dana offered a different opinion. She testified:

A.  [Grandmother] is on some pretty strong medication where I have seen her not be able to be woken up. I've seen her stumbling, needing help getting to her bed. So, I would be concerned with being able to take care of a child.

Q.  Has that happened many times or just a few?

A.  Quite a few times in my three years of knowing them.

On cross-examination, Dana admitted that, save for one visit the previous month, she had not been to Grandparents' home in two years. She also acknowledged she willingly left her baby in Grandmother's care "before this happened."

Grandmother testified she does not drink alcohol. She tested positive for alcohol during this case but contended the positive result was from cough syrup she ingested the previous evening. She voluntarily submitted to a breathalyzer three times per day for 30 days and never tested positive.

Palmer testified Paige made a disclosure about Grandmother's drinking. Paige heard a song with the words "drink" and "drunk." Paige then said, "My Jammie does that." Palmer stated, "She said her Jammie drinks and gets drunk and she can't carry her to bed."

Arredondo raised her concern about the level of alcohol in Grandmother's system when she tested positive: 2,790 nanograms per milliliter of ethyl glucuronide, a metabolite of alcohol. Arredondo testified she consulted with Bruce Jefferies, who operates a drug testing facility, about whether Grandmother's test result could be attributed to cough syrup. Jefferies reportedly asked Arredondo if Grandmother had ingested the entire bottle of cough syrup.

### 2.	Paige's removal from Grandparents' home

Near the end of October 2017, the trial court ordered Paige to be moved from Grandparents' care within 24 hours. Testimony at trial suggests Paige was moved because Father had been at Grandparents' home in violation of a court order. Such an order does not appear in the record, nor did any witness testify about the terms of such an order. Father and Grandparents testified no order was violated because Paige was not there when Father visited; she was in school.

### 3.	Willingness and ability to care for Paige

Paige loved Grandparents. When she was released from the hospital and saw Grandmother, Santiago testified, Paige "lit up and everything changed . . . . She went up and gave grandma a big hug." Grandfather testified he and Grandmother will adopt Paige if needed and raise her through adulthood. He said they are financially stable and able to meet all of Paige's needs. Photos offered by Grandparents show Paige smiling and playing with a little girl from Grandparents' neighborhood.

Grandmother testified about the last visit they had with Paige. She said Paige climbed into her lap and said, "Jammie, I want to hide in the back of the truck and go home with you." From Palmer's perspective, though, the visit "didn't go very well." Palmer said Grandparents were "taunting [Paige] with gifts" by telling her they would celebrate Christmas when she returned to their home, asking her if she wanted to go on vacation to Florida, and promising her they would take her to the

mall and she could choose anything she wanted. On the recommendations of Department supervisors, Paige's therapist, Arredondo, and Paige's attorney ad litem, Palmer discontinued the visits with Grandparents.

Several people were confident Grandparents could care for and protect Paige, even from Father. Mother testified, "[Grandfather] doesn't care. He'll protect [Paige]." Theresa Watts, a volunteer with Child Advocates, Inc. (the agency that employs Arredondo) formerly assigned to this case, reportedly believed Paige should stay with Grandparents. Santiago testified he had no concerns about Grandparents when he placed Paige with them.

Palmer, Arredondo, and McCartney disagreed, and eventually Santiago came to share their view. They believed it was not in Paige's best interest to be placed with Grandparents. Palmer and Arredondo both said they were concerned by the amount of medication Grandmother was taking, though they admitted they are not experts in pain management. They also expressed concern that Grandfather, due to his work schedule, would not be available to take care of Paige and the task would fall primarily to Grandmother. McCartney was troubled by the fact that Grandmother lost custody of her children in California. Palmer, Arredondo, and McCartney had not visited Grandparents' home.

### F. Foster mother

Paige was placed with her foster mother after she was removed from Grandparents' home. Vines reported Paige said she wants to stay with her foster mother and does not want to live with Mother, Father, or Grandparents. Palmer agreed, noting Paige had expressed the same desire to her. Palmer also said Paige had not asked her about Grandparents in the 10 months Palmer had been assigned to the case.

Palmer, Arredondo, and McCartney all testified Paige's best interest would be

29

served by staying with her foster mother. Palmer described Paige's relationship with her foster mother:

> Friendly, [Paige] engages with her really well. She talks to [Paige] like a child should be talked to. She's warm and friendly and [Paige] seems to respond really well to her.

Arredondo added:

> There is a lot of trust. She has been placed there for a little under a year. She was placed there since October of last year, and a lot of trust, a lot of communication between the two. [Paige] is strongly dependent on the foster parent. There's a lot of laughter.

McCartney commented on Paige's significant improvement during her time with her foster mother. Arredondo said the foster mother had been active in ensuring Paige received all the services she needed:

> She has been up and down to the school. She's been [making sure] that all of her ARD, her IEP meetings take place, and making sure that all of the goals are meeting all of her needs. She's been fighting for occupational [and] speech . . . therapy services. . . .

Vines believed Paige should remain with the foster mother. Based on her observations, Vines testified, the foster mother is meeting "if not exceeding" all of Paige's needs. Brams testified that, based on his limited observation, the foster mother appeared to have "created adequate boundaries and interacted with [Paige] in a constructive and appropriate manner."

The foster mother testified she and Paige had formed a significant bond during their year together. They loved one another. In her opinion, Paige felt safe and secure with her. She wants to adopt Paige if the parents' rights are terminated. The foster mother noted the other foster children in her home called her by her name, but Paige, of her own accord, elected to call her "mom."

### G.     Trial court's findings

The trial court found Mother engaged in the conduct described in subsections D (endangerment by environment), E (endangerment by conduct), and O (failure to comply with court order) of section 161.001(b)(1) and found Father engaged in the conduct described in subsections E and O. The court additionally found termination of Mother's and Father's parental rights was in Paige's best interest. The trial court appointed the Department to be Paige's managing conservator. Mother, Father, and Grandparents timely appealed.

## II.     Termination

### A.     Burdens of proof and standards of review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, the child's emotional and physical interests must not be sacrificed to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Parental rights may be terminated if clear and convincing evidence shows (1) the parent committed an act described in section 161.001(b)(1) of the Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2). Only one predicate finding under section 161.001(b)(1), along with the best-interest determination, is necessary to support termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007. This high burden reflects the severity of termination.

The heightened burden of proof results in heightened standards of review for

evidentiary sufficiency:

- *Legal sufficiency.* We consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could disbelieve. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

- *Factual sufficiency.* We consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that dispute in favor of its finding. *C.H.*, 89 S.W.3d at 25.

The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder "could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

### B.     Predicate ground for termination: endangerment

Mother's and Father's first and second issues challenge the legal and factual sufficiency of the evidence to support the trial court's findings under subsections D, E, and O of section 161.001(b)(1). For the reasons that follow, we conclude sufficient evidence supports the subsection D finding as to Mother and the subsection E finding as to Father. We therefore do not review the subsection E finding as to Mother or the subsection O finding as to either parent.

#### 1.     Legal standards

If a parent has had his or her parental rights terminated based on a finding under section 161.001(b)(1)(D) or (E), that finding may serve as the basis for a future

termination of parental rights. Tex. Fam. Code Ann. § 161.001(b)(1)(M) (allowing termination if parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state"). Because subsection M alone provides a sufficient basis to terminate parental rights based on a previous subsection D or E finding, due process concerns, coupled with the requirement for a meaningful appeal, mandate a court of appeals affirming a termination on either subsection D or E provide the details of its analysis. *See In re N.G.*, No. 18-0508, __ S.W.3d __, 2019 WL 2147263, at *4 (Tex. May 17, 2019).

"To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Subsection D requires a finding that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E requires a finding that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E). In evaluating endangerment under subsection D, we consider the child's environment before the Department obtained custody of the child. *See In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Under subsection E, however, courts may consider conduct both before and after the Department removed the child from the home. *See S.R.*, 452 S.W.3d at 361.

### 1.     Mother: endangerment by environment (161.001(b)(1)(D)

Endangerment under subsection D may be established by evidence related to the child's environment. *S.R.*, 452 S.W.3d at 360. "Environment" refers to the

acceptability of living conditions, as well as a parent's conduct in the home. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *See In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection D. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). Conduct implying awareness of an endangering environment shows endangerment. *S.M.L.*, 171 S.W.3d at 477.

Luke, Mother's live-in boyfriend or perhaps fiancé, abused Paige badly enough to warrant her hospitalization. Mother may not have intended Luke to be alone with Paige, but he was alone with her, and Mother knew that before Luke hurt Paige. Mother also knew her fully potty-trained six-year-old daughter urinated on herself in Luke's care, and she elected not to go home or investigate further.

Mother offered varying accounts of the incident. Santiago said Mother told him she knew there was an emergency but believed she could not leave work. At trial, she testified she did not know there was an emergency. Santiago said Mother told him she tried but could not wake Paige. At trial, she testified she did not try to wake her and did not see the bruises on her face. As the sole arbiter of a witness' credibility, the trial court was free to believe the evidence that Mother was aware of but disregarded an emergency and/or that she was aware of but delayed seeking medical treatment for Paige's injuries. The trial court could also consider the fact Mother changed her story.

Mother swore she had no reason to believe Luke was abusive or Paige would

34

be in danger with him. But she knew he had been convicted of driving while intoxicated more than once and still drank alcohol. Luke admitted drinking four or five beers while he was taking care of Paige before Mother came home. The trial court could have inferred Mother was or should have been aware Luke posed a danger to Paige, even if she did not know the specific danger.

The evidence supports an inference that Mother consistently minimized the risk Paige faced. Palmer testified Mother did not appear to understand the severity of why Paige was under Department care or even believe Paige's outcries of abuse. Further, the trial court could consider Mother's acquiescence in allowing Paige to stay with Father, theoretically for a full month, despite suspecting he physically abused Paige in the past. Mother did not suggest she tried to impose additional safeguards for Paige during her time with Father, such as seeking to modify the possession order or asking Grandparents to supervise Father.

Considering all the evidence in the light most favorable to the finding, we conclude the trial court could have formed a firm conviction or belief that Mother endangered Paige under subsection D. The evidence is therefore legally sufficient to support that finding. Our factual sufficiency analysis takes into account many disputed facts, including whether Mother knew or should have known of the emergency at home and of her daughter's injuries. Even considering those disputed facts, we conclude the evidence is factually sufficient to support the subsection D finding, because the trial court could have reasonably resolved those disputes in favor of that finding.

### 2. Father: endangerment by conduct (161.001(b)(1)(E))

Under subsection E, the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Termination under

35

subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from parents' misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.L.H.*, 515 S.W.3d 60, 92 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

"Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *accord S.R.*, 452 S.W.3d at 361. Violence does not have to be directed toward the child or result in a final conviction. "Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction." *In re V.V.*, 349 S.W.3d 548, 556 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also S.M.L.*, 171 S.W.3d at 479.

A parent's abuse of a child endangers that child but also endangers other children the parent may have in his care. *See In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2014). When determining if a child is at risk for abuse or neglect by her parent, the parent's treatment of other children must be considered: "Part of [the risk] calculus includes the harm suffered or the danger faced by other children under the

parent's care." *Id.*

The record is replete with evidence of domestic violence and child abuse by Father. Mother testified Father choked her as she held Paige. Dana called the police several times alleging Father had assaulted her. At least one of those allegations would likely have led to an arrest. The Department and law enforcement investigated reports of Father's physical abuse of Dana's children. The sheriff's deputy did not find evidence to support Dana's daughter's allegation that Father choked her, but the Department found reason to believe he did. Paige reported she saw Father hurt Dana and Dana's daughter. And she made an outcry of Father's abuse of herself, alleging he hit her with a belt and pinched her.

The trial court also heard evidence Father angers easily, lacks impulse control, and has an "explosive temper." Consistent with Landry's report that Father lashes out at Dana, text messages Father sent Dana are riddled with expletives and threats: "Keep it up and I will come back and I'll beat your f****** head in," and "Go ahead f****** b**** I f****** hate you I will f****** kill you b****. Go have your phone all you f****** want to b**** . . . ." He also threatened a Department caseworker: "[T]hat n***** is dead I'm done with her I'm f*** her [up]."

Father denied most of the allegations of abuse, and he denied sending the message about the caseworker. As the sole arbiter when assessing the credibility and demeanor of a witness, the trial court was free to discredit Father's self-serving testimony. *See H.R.M.*, 209 S.W.3d at 109.

Applying the applicable standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's finding under subsection E regarding Father.

### C.  Best interest

#### 1.  Legal standards

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). Texas courts presume two conditions to be in a child's best interest: (1) prompt, permanent placement in a safe environment, *id.* § 263.307(a); and (2) remaining with the child's natural parent. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g). The best-interest analysis focuses on the child, not the parent. *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.).

Courts may consider these non-exclusive factors, known as the *Holley* factors, in the best-interest analysis: the desires of the child; the physical and emotional needs of the child now and in the future; the physical and emotional danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The Family Code also identifies factors the court may consider in evaluating a parent's willingness and ability to provide the child with a safe environment. Tex. Fam. Code Ann. § 263.307(b). Finally, evidence supporting the statutory predicate of termination is relevant to the best-interest analysis. *S.R.*, 452 S.W.3d at 366.

### 2. Application

*Paige's desires and needs.* Grandmother testified Paige told her at their last visit, some eight months before trial, that she wanted to "hide in the back of the truck and go home with you." Vines, Palmer, and the foster mother testified Paige said she wants to live with the foster mother.

With an IQ of 70–75, Paige will likely struggle with some aspects of daily living and academic prowess, according to Brams. He testified she will need educational help for the foreseeable future, and the ARD report from the fall of 2017 suggests the same.

The evidence supports an inference that Paige's parents were not meeting her educational needs. McCartney testified Mother had not followed up on referrals Paige's doctor made to a neurologist and for an ECI assessment. Father testified he knew of Paige's delays but did not seek consultation or treatment for them. We note, though, that Grandparents attended one of two ARD meetings noted in the record, and the second meeting was held after Paige was removed from their home.

By contrast, the foster mother was said to be meeting Paige's educational needs fully. Arredondo testified the foster mother ensured ARD meetings occurred and the IEP met Paige's needs. She also had been fighting to obtain occupational and speech therapy for Paige.

*Endangerment by Mother and Father.* Evidence supporting termination under the grounds listed in section 161.001(b)(1) can be considered in support of a finding that termination is in the child's best interest. *See C.H.*, 89 S.W.3d at 27. Accordingly, the evidence of Mother's and Father's endangerment of Paige, discussed above, is relevant to the best-interest analysis.

*Service plan.* Both parents completed the majority of their service plans.

Palmer testified Mother and Father both failed to provide proof of stable housing and employment. But Palmer admitted she knew Mother was working at a motel and living with a relative. Arredondo admitted Father had been working "consistently," and it was undisputed he lived with Dana throughout this case. Father's only other deficiency was not completing individual therapy. However, his therapist testified Father is not ready to be discharged. It is unreasonable to equate a parent who does not engage in therapy at all with a parent whose therapist indicates more therapy is needed.

**_Willingness and ability to care for Paige._** The record indicates Mother has shown varying degrees of protective capacity for Paige. In the summer of 2016, Mother cooperated with the Department as it investigated bruises on Paige. The next summer, Mother took little to no action upon hearing Paige had urinated on herself and there was an emergency at home. Palmer and Arredondo both worried Mother did not grasp the seriousness of how Paige came to be under Department care.

Father, the record suggests, may not be able to protect and care for Paige due to his deep-seated anger and his lack of impulse control, particularly given her frequent "emotional breakdowns." The Department also found reason to believe he had physically abused Paige in the summer of 2016 and Mallory a year later.

Grandparents unquestionably are willing to care for Paige. No evidence suggests Grandfather is unable to take care of Paige. Grandmother, on the other hand, raised a few red flags. First, Palmer, Arredondo, and McCartney all worried about the amount of medication she was taking. Grandfather, Grandmother, and Father all testified her medication does not prevent her from taking proper care of Paige, but Dana testified she saw Grandmother stumbling and unrousable. Grandmother denied drinking alcohol and attributed her positive test result to cough syrup, but her result caused a lab operator to ask if she had ingested the entire bottle

of cough syrup. McCartney also expressed concern that Grandmother lost custody of her sons.

The foster mother is willing and able to take care of Paige. Vines testified the foster mother appeared to be meeting "if not exceeding" Paige's needs. Brams said the foster mother appeared to have established adequate boundaries and interacted with Paige appropriately. Neither Palmer nor Arredondo had any concerns about the foster mother or her home.

***Programs available.*** Paige receives special education services from her school district. There is no evidence about other programs available to assist Mother, Father, Grandparents, or the foster mother in parenting Paige.

***Stability of proposed placement.*** The Department intends for Paige to remain in her foster home so the foster mother can adopt her. As discussed, all the evidence shows the foster placement is safe and stable.

***Acts or omissions and any excuses for them.*** Mother contended she did not know Paige was hurt, and she would have woken Paige and taken her to the hospital had she known. Father explained his Nazi postings on his Facebook page by saying, "I went through phases in life."

## D.     Conclusion on termination

Applying the applicable standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's finding that Mother and Father endangered Paige under subsections D and E, respectively, of section 161.001(b)(1). Accordingly, we do not review the trial court's findings under subsections E and O for Mother or subsection O for Father. *A.V.*, 113 S.W.3d at 362. We likewise conclude the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother's and Father's parental rights is in

41

Paige's best interest. We overrule Mother's and Father's issues.

## III.   Conservatorship

In their third issue, Grandparents complain of the trial court's decision to appoint the Department, rather than them, as Paige's permanent managing conservator.

### A.   Burden of proof and standards of review

The Texas Family Code creates a rebuttable presumption that a parent will be named a child's managing conservator unless the court finds that such appointment would not be in the child's best interest "because the appointment would significantly impair the child's physical health or emotional development." Tex. Fam. Code Ann. § 153.131(a). If the trial court terminates the parent-child relationship with respect to both parents or to the only living parent, "the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a). "The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship[.]" Tex. Fam. Code Ann. § 153.002.

Termination of parental rights and appointment of a non-parent as sole managing conservator are two distinct issues, differing in elements, standards of proof, and standards of review. *Compare* Tex. Fam. Code Ann. § 161.001 *with* Tex. Fam. Code Ann. § 153.131(a); *see also In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007). Unlike those necessary to support termination of parental rights, the facts necessary to appoint a non-parent as sole managing conservator need be established by a mere preponderance of the evidence. *See* Tex. Fam. Code Ann. § 105.005; *J.A.J.*, 243 S.W.3d at 616. Likewise, the standard of review for the appointment of a non-parent as sole managing conservator is less stringent than the standard of

review for termination of parental rights. *J.A.J.*, 243 S.W.3d at 616. We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion only. *Id.* Therefore, we reverse the trial court's appointment of a non-parent as sole managing conservator only if we determine the appointment is arbitrary or unreasonable. *Id.*

Because both parents' rights had been terminated, the trial court was required under section 161.207 of the Family Code to appoint a "suitable, competent adult," the Department, or another permissible agency as Paige's managing conservator. *See In re C.N.S.*, No. 14–14–00301–CV, 2014 WL 3887722, at \*13 (Tex. App.—Houston [14th Dist.] Aug. 7, 2014, no pet.) (mem. op.). The appointment may be considered a "consequence of the termination." *In re L.G.R.*, 498 S.W.3d 195, 206 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

## B.    Application

As discussed, several red flags were raised about Grandparents as a possible placement for Paige. Grandmother was taking many medications, including several narcotic painkillers. Some evidence suggests the medication impaired her ability to take care of Paige. There is also evidence of a high level of an alcohol metabolite in her system, and it appears attribution of that level to a typical dosage of cough syrup is unreasonable. We must defer to the fact finder's implicit assessment of credibility and demeanor of witnesses as well as its resolution of factual disputes. *See L.M.I.*, 119 S.W.3d at 712. Grandfather himself appeared willing and able to take care of Paige. However, his work schedule was such that the primary responsibility for Paige would likely fall to Grandmother.

Because Grandparents have not shown the trial court's decision was arbitrary or unreasonable, we find the trial court did not abuse its discretion in appointing the Department, rather than them, as Paige's managing conservator. We overrule

43

Grandparents' third issue.

**CONCLUSION**

We affirm the trial court's final decree.

/s/     Jerry Zimmerer
Justice

Panel consists of Justices Christopher, Bourliot, and Zimmerer.